Alan Alexander Beck (HI Bar No. 9145)
Law Office of Alan Beck
2692 Harcourt Drive
San Diego, CA  92123
Telephone: (619) 905-9105
Email:  Alan.alexander.beck@gmail.com

RICHARD L HOLCOMB (HI Bar No. 9177)
Holcomb Law, A Limited Liability Law Corporation
733 Bishop St., Suite 1478
Honolulu, HI  96813
Telephone: (808) 545-4040
Facsimile: (808) 356-1954
Email: rholcomblaw@gmail.com

Attorney for Plaintiffs Peter Roa and Dirck Sielken

## IN THE DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| PETER ROA, and | CIVIL ACTION No.: 23-00079 |
| DIRCK SIELKEN, | |
| Plaintiffs, | VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |
| vs. | |
| ANNE E. LOPEZ, in her official capacity as Attorney General for the State of Hawai'i, | |
| Defendant. | |

## VERIFIED COMPLAINT FOR DECLARATORY
## AND INJUNCTIVE RELIEF

COME NOW the Plaintiffs, PETER ROA and DIRCK SIELKEN, ("Plaintiffs"), by and through their undersigned counsel, and complain of the Defendant as follows:

## I.      PARTIES

1.      Plaintiff Peter Roa is an adult male resident of the State of Hawaiʻi, resides in Honolulu, and is a citizen of the United States

2.      Plaintiff Dirck Sielken is an adult male resident of the State of Hawaiʻi, resides in Honolulu, and is a citizen of the United States..

3.      Defendant Anne E. Lopez is the Attorney General of Hawaiʻi. She is the chief law enforcement officer of Hawaiʻi. Pursuant to Section 26-7 of the Hawaiʻi Revised Statutes, Defendant Lopez has "the ultimate responsibility for enforcing penal laws of statewide application." *Amemiya v. Sapienza*, 63 Haw. 424, 427, 629 P.2d 1126, 1129 (1981).  The Department of the Attorney General, which Ms. Lopez directs, "administer[s] and render[s] state legal services, including furnishing of written legal opinions to the governor, legislature, and such state departments and officers as the governor may direct," including the restrictions complained of herein.  Haw. Rev. Stat. Ann. § 26-7 (West).  She is sued in her official capacity.

## II.      JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, 2201, 2202 and 42 U.S.C. § 1983 and § 1988.

5.      Venue lies in this Court pursuant to 28 U.S.C. § 1391.

## III.      STATEMENT OF FACTS

6.      The State of Hawai'i ("Hawai'i") generally bans the possession of "deadly or dangerous weapons" outside the possessor's home without some prior authorization.  Haw. Rev. Stat. § 134-51.

7.      "[A] person who carries a prohibited weapon upon his person, whether concealed or unconcealed, is a person 'armed' within the meaning of the statute." *State v. Ogata*, 58 Haw. 514, 519-20, 572 P.2d 1222, 1226 (1977). "HRS § 134-51 may be violated by the carrying of deadly or dangerous weapons, whether concealed or unconcealed." *Id.* at 520, 572 P.2d at 1227.

8.      While this ban covers switchblade knives, *see  Id.*, the State also has a separate statutory prohibition on the manufacture of, selling, owning, and/or transporting switchblade knives:

> Whoever knowingly manufactures, sells, transfers, possesses, or transports in the State any switchblade knife, being any knife having a blade which opens automatically (1) by hand pressure applied to a button or other device in the handle of the knife, or (2) by operation of inertia, gravity, or both, shall be guilty of a misdemeanor.

Haw. Rev. Stat. Ann. § 134-52(a) (West).

3

**a. Hawaiʻi actively enforces the ban through criminal prosecutions.**

9.    Hawaiʻi has not disavowed enforcement of the ban.

10.    In fact, the State has a storied history of prosecuting violations of the

ban.   Examples of appellate decisions involving such prosecutions include:

- A 1987 Hawaiʻi Intermediate Court of Appeals ("ICA") opinion discusses a Hawaiʻi Defendant that had been acquitted of the charges of "driving on the left of center of the roadway … and possession of a switchblade knife in violation of HRS § 134-52." *State v. Arakaki*, 7 Haw. App. 48, 50, 744 P.2d 783, 785 n. 3 (1987), *overruled on other grounds, State v. Dow*, 72 Haw. 56, 806 P.2d 402 (1991);

- A 1988 Hawaiʻi Supreme Court analyzes a conviction "for the Illegal Possession of a Switchblade Knife plus the Third–Degree Promotion of the Harmful Drug valium in violation of Hawaii Revised Statutes." *State v. Reed*, 70 Haw. 107, 117, 762 P.2d 803, 804 (1988);

- A 1989 ICA case states that "Defendant Darryl Louis Ho (Defendant) appeals from his conviction by a jury for the offenses of Promoting a Dangerous Drug in the Third Degree, Hawaii Revised Statutes (HRS) § 712–1243 (1985), Count II; Promoting a Detrimental Drug in the Third Degree, HRS § 712–1249 (1985), Count III; and Possession of a switchblade knife, HRS § 134–52 (1985) …" *State v. Ho*, 7 Haw. App. 516, 516, 782 P.2d 29, 29–30 (1989), *overruled on other grounds by State v. Hoey*, 77 Haw. 17, 881 P.2d 504 (1994); and

- In 2005, the ICA decided a case involving a defendant who had been indicted "for Promoting a Dangerous Drug in the Second Degree, Unlawful Use of or Possession with Intent to Use Drug Paraphernalia, Place to Keep Loaded Firearm, Place to Keep Pistol or Revolver (2 counts), and Possession of a Switchblade Knife." *State v. Iwatate*, 108 Haw. 361, 363, 120 P.3d 260, 262 (Ct. App. 2005).

11.    Indeed, the State has advocated for application of the switchblade ban

codified at HRS 134-52 to cases where the Defendant did not possess a blade that

opened automatically:

- In the early 1990's, a juvenile Defendant's conviction was overturned after the juvenile was successfully prosecuted for a violation of the ban on switchblade knives pursuant to HRS § 134-52 where the juvenile had actually possessed a butterfly knife. *In Int. of Doe*, 73 Haw. 89, 90–96, 828 P.2d 272, 273 (1992);

- In 1990, a Defendant was indicted by a grand jury for a violation of HRS § 134-52 where the Defendant possessed a butterfly knife. *State v. Jhun*, 83 Haw. 472, 474, 927 P.2d 1355, 1357 (1996). Apparently, that prosecution continued until after the *Doe* decision, *supra*., and the prosecution dismissed the charge pursuant to *Doe*. *Id*. n. 3.

12. The ICA has found that even a pocketknife, that does not but could potentially be modified to open automatically, could justify a search if the handle of the pocketknife was felt by a police officer conducting a *Terry* frisk:

> We recognize that law enforcement personnel, based on their experiences, may view even small pocketknives as dangerous instruments. "This attitude is supported by the fact that occasionally a small knife is found to have a matchstick inserted under the blade so that the knife can be opened hurriedly merely by catching the protruding blade point on the trouser pocket as the knife is taken out. The effect is the same as having a switchblade knife." L. Tiffany, D. McIntyre, Jr., and D. Rotenberg, *Detection of Crime* (The Report of the American Bar Foundation's Survey of the Administration of Criminal Justice in the United States) 47 (1967). However, it is incumbent on a police officer, at a suppression hearing, to articulate the specific reasons for any fears that he may have for his safety.

*State v. Bolosan*, 78 Haw. 98, 105, 890 P.2d 685, 692 n. 8 (Ct. App. 1994), *aff'd in part, rev'd in part*, 78 Haw. 86, 890 P.2d 673 (1995), and *overruled by State v. Vallesteros*, 84 Haw. 295, 933 P.2d 632 (1997).

13.     The State continues to prosecute violations of HRS § 134-52.  Plaintiffs were able to identify the following prosecutions through media reports and the Hawai'i State Judiciary's "eKokua" computerized system where information pertaining to cases prosecuted in Hawai'i courts is publicly available:

- *State v. Trish Flores*, 5PC-18-0000220 – Felony Information filed August 20, 2018 charging Defendant with possession of switchblade in violation of HRS § 134-52;

- *State v. Otis Alexander*, 1DCW-21-0001530 – Defendant charged with possession of switchblade in violation of HRS § 134-52 via complaint filed June 3, 2021;

- *State v. Kaelan A. Starmer*, 2DCW-22-0000490 – Defendant charged with possession of switchblade in violation of HRS § 134-52 via complaint filed April 26, 2022;

- *State v. Kalani Rush*, 2DCW-22-0000492 – Defendant charged with possession of switchblade in violation of HRS § 134-52 via complaint filed April 26, 2022; and

- *State v. Allison Hethcote*, 2DCW-22-0000493 – Defendant charged with possession of switchblade in violation of HRS § 134-52 via complaint filed April 26, 2022.

True and correct copies of the information available on "eKokua" for each of these cases and which are believed to include all Court Minutes and docket information are attached hereto as **Exhibits One** through **Five**, respectively.

14.     Plaintiffs are not "authorized by law" to possess, carry, or transfer a switchblade knife and no known procedure exists that would allow Plaintiffs or other law-abiding citizens to achieve such authorization.

6

15.    Plaintiffs bring a facial and as applied challenge to Hawaiʻi's ban on switchblades.

### b.  The Second Amendment

16.    The Second Amendment to the United States Constitution provides: "A well-regulated Militia being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed."

17.    The Second Amendment guarantees individuals a fundamental right to keep and carry arms for self-defense and defense of others in the event of a violent confrontation. *District of Columbia v. Heller*, 554 U.S. 570 (2008); *McDonald v. Chicago*, 561 U.S. 742 (2010); *Caetano v. Massachusetts,* 577 U.S. 1027 (2016).

18.    The Supreme Court has recently affirmed that this right of self-defense does not extinguish at the threshold of the citizen's front door.  *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, __ U.S. __, 142 S. Ct. 2111, 2134–35 (2022) (holding specifically that the Second Amendment "presumptively guarantees" the right to bear arms in public for the purpose of self-defense). "To confine the right 'to bear' arms to the home would nullify half of the Second Amendment's operative protections" and "would make little sense given that self-defense is 'the central component of the [Second Amendment] right itself.'"  *Id.*

19.     The Second Amendment extends, *prima facie*, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding. *Heller,* 554 U.S. at 582; *Caetano*, 577 U.S. at 411.

20.     Knives are a utensil, or a tool designed for cutting and/or piercing, consisting of a flat piece of hard material, usually steel or other metal (the blade), usually sharpened and attached to a handle.

21.     Switchblade knives are a type of knife.  As defined by HRS § 134-52 "switchblade knives" include "any knife having a blade which opens automatically (1) by hand pressure applied to a button or other device in the handle of the knife, or (2) by operation of inertia, gravity, or both …"

22.     While *Heller* and *Bruen* addressed the right to bear actual firearms, it is obvious that the right extends to switchblade knives. Arms are "'weapons of offence, or armour of defence.' 1 Dictionary of the English Language 107 (4th ed.)' They are anything that a man [or woman] wears for his defense, or takes into his hands, or uses in wrath to cast at or strike another.' 1 A New and Complete Law Dictionary (1771)."  *District of Columbia v. Heller*, 554 U.S. at 581.

23.     Switchblade knives as defined by HRS § 134-52 are "arms" within the meaning of the Second Amendment.

24.     Given the decision in *Heller*, Defendants may not:  completely ban the keeping and bearing of arms for self-defense where those arms are not dangerous

*and* unusual; deny individuals the right to carry arms in non-sensitive places; deprive individuals of the right to keep or carry arms in an arbitrary and capricious manner; or impose regulations on the right to keep and carry arms that are inconsistent with the Second Amendment.  *See Caetano v. Massachusetts*, 136 S. Ct. 1027 (2016); *Heller v. District of Columbia*, 801 F.3d 264 (D.C. Cir. 2015); *Palmer v. District of Columbia*, 59 F.Supp.3d 173 (2014).

25.    The phrase "dangerous and unusual weapons" historically refers to a manner of using the weapon.  No weapon was considered "dangerous and unusual" *per se*. *See* Page, Daniel Richard, Dangerous and Unusual Misdirection: A Look at the Common Law Tradition of Prohibiting Going Armed with Dangerous and Unusual Weapons to the Terror of the People, as Cited in District of Columbia versus Heller (May 4, 2011). Available at SSRN: https://ssrn.com/abstract=1859395. or http://dx.doi.org/10.2139/ssrn.1859395 A true and exact copy of the article is attached as **Exhibit Six.**

26.    Therefore, a switchblade cannot be intrinsically dangerous and unusual and the mere ownership of a switchblade cannot constitute the ownership of a dangerous and unusual item.

27.    Even if the phrase dangerous and unusual is interpreted to mean an unusually dangerous weapon, the State cannot meet its burden of showing that switchblades are unusual or more dangerous than any other knife.

### c. Switchblades are neither dangerous nor unusual.

28.     Gunshots are generally more lethal than knife injuries.

29.     Wilson & Sherman's 1960 study of hospital admissions for abdominal wounds found that abdominal stabbing cases ended in death 3.1 percent of the time, while 9.8 percent of gunshot abdominal wounds were lethal. *See Harwell Wilson & Roger Sherman, Civilian Penetrating Wounds to the Abdomen,* 153 ANNALS OF SURGERY 639, 640 (1961). A true and correct copy of this study is attached as **Exhibit Seven**.

30.     An examination of 165 family and intimate assaults (FIA) in Atlanta, Georgia in 1984 found similar results: firearms-associated FIAs were three times more likely to result in death than "FIAs involving knives or other cutting instruments." *See Linda E. Saltzman, James A. Mercy, Patrick W. O'Carroll et al., Weapon Involvement and Injury Outcomes in Family and Intimate Assaults*, 267 JAMA 3043 (1992).  A true and correct copy of this study is attached as **Exhibit Eight**.

31.     Another study examined all of New Mexico's penetrating traumas ("firearm or stabbing injury") "who presented to either the state Level-1 trauma center or the state medical examiner" from 1978 to 1993. This study found that while nonfatal injury rates were similar for firearms and stabbing (34.3 per 100,000 person-years for firearms, 35.1 per 100,000 person-years for stabbing), firearm

10

fatality rates were much higher than for knives: 21.9 vs. 2.7 respectively. In other words, 39.0 percent of firearm penetrating traumas were fatal, compared to 7.1 percent of knife penetrating traumas.  Firearm injuries were 5.5 times more likely to result in death than were knife injuries.  But not all of the New Mexico penetrating traumas were criminal attacks; 44 percent of the firearms deaths and 57 percent of the knife deaths were suicides. While 8 percent of the firearms deaths were accidents, so were 3 percent of the knife deaths. *See* 123 Cameron Crandall, Lenora Olson, Lynne Fullerton, et al., Guns and Knives in New Mexico: Patterns of Penetrating Trauma, 1978-1993, 4 ACAD. EMERGENCY MEDICINE 265 (1997).   A true and exact copy of this study is attached as **Exhibit Nine**.  As for the remaining firearms deaths classified as "homicide," about 7-13 percent of them were probably justifiable homicides by persons who were not law enforcement officers. GARY KLECK, POINT BLANK: GUNS AND VIOLENCE IN AMERICA 114 (1991). It is unknown whether a similar percent of the knife homicides was justifiable.

32.    In 2019 (the most recent year for which data is available online) information collected by the FBI regarding types of weapons used in violent crime showed that firearms were used in 73.7 percent of the nation's murders, 36.4 percent of robberies, and 27.6 percent of aggravated assaults. *See* https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019/topic-pages/violent-crime (last visited 2/7/2023).          https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-

2019/tables/expanded-homicide-data-table-7.xls        (last   visited   2/7/2023).

https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019/tables/robbery-table-3.xls  (last visited 2/7/2023). https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019/tables/aggravated-assault.xls  (last visited 2/7/2023).

33.    Knives and other edged weapons accounted for approximately 10.6% of murders, 8.5% of robberies and 17.5% of aggravated assaults in 2017. *See Id; See also*        https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019/topic-pages/violent-crime  (last   visited   2/7/2023).        https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019/tables/expanded-homicide-data-table-7.xls        (last visited    2/7/2023).        https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019/tables/robbery-table-3.xls  (last visited 2/7/2023). https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019/tables/aggravated-assault.xls        (last    visited 2/7/2023).

34.    Historically,  local  and  state  governments  had  attempted  to  justify various bans on switchblade knives based on a belief that switchblade knives could be  opened  faster  than  folding  knives,  thus  increasing  the  dangerousness  of  the switchblade knife.

35.    Defendant can show no increase in the dangerousness of a folding knife due to the speed of opening.

36.   Moreover, switchblades do not open faster than other legal folding knives.

37.   Plaintiffs' anticipated expert, Burton Richardson, analyzed the opening speed of several types of knives, *i.e.*, a Benchmade switchblade, a common pocket knife, a Cold Steel Frenzy (which does not have a "thumb plate" like the Espada, but can be opened with one hand due to the weight of the blade), a Cold Steel "Espada" (that opens manually with the assistance of a "thumb plate" designed to catch on the hem of the pocket in which it is carried).  Richardson Decl. ¶ 7.

38.   Mr. Richardson found that the both the Spyderco and the Cold Steel "Espada" were faster than the switchblade:

|  | DRAW 1 seconds.milliseconds | DRAW 2 seconds.milliseconds | DRAW 3 seconds.milliseconds |
|---|---|---|---|
| Benchmade Switchblade | 01.467 | 01.833 | 01.500 |
| Cold Steel Frenzy | 01.000 | 01.033 | 00.900 |
| Basic Folding Knife | 01.200 | 01.200 | 01.133 |
| Cold Steel Espada | 00.900 | 00.767 | 00.767 |

Richardson Decl., ¶ 10.

39.   A video of Mr. Richardson's test can be found on YouTube at the following link:  https://www.youtube.com/watch?v=gdwPQ_IILZM

**d.    Switchblade knives are in common use.**

40.    In *United States v. Henry*, 688 F. 3d 637 (9th Cir. 2012), the Ninth Circuit held that machine guns are not protected by the Second Amendment because they are dangerous and unusual. "A modern machine gun can fire more than 1,000 rounds per minute, allowing a shooter to kill dozens of people within a matter of seconds. See George C. Wilson, Visible Violence, 12 NAT'L J. 886, 887 (2003). Short of bombs, missiles, and biochemical agents, we can conceive of few weapons that are more dangerous than machine guns. A machine gun is 'unusual' because private possession of all new machine guns, as well as all existing machine guns that were not lawfully possessed before the enactment of § 922(o), has been unlawful since 1986. Outside of a few government-related uses, machine guns largely exist on the black market." Id. at 640.

41.    However, unlike machineguns which have been artificially limited in ownership by § 922(o), switchblades are arms in common use for lawful purposes, including self-defense.

42.    Knives, including those that open automatically by pressing a button or with the assistance of gravity, (*i.e.*, switchblade knives as defined in HRS § 134-52), are bearable arms.

43.    In the past few years, knife laws have been loosening nation-wide.

44.     Twenty-one states have repealed or liberalized their knife laws since 2010, many of them with bipartisan support, including Colorado, Michigan and Illinois.   *See*   https://www.chicagotribune.com/news/nationworld/ct-knife-rights-activists-nra-20180915-story.html    (last visited 4/4/2019); *See also* Lawson Declaration ¶ 9

45.     Dan Lawson, Plaintiffs' anticipated expert on knives and the knife industry, estimates that 1.1 million "switchblade knives" (as defined by HRS § 134-52) are available in the U.S. market annually.  Lawson Decl. ¶ 25.  Mr. Lawson further opines that approximately 20 million "switchblade knives" are privately possessed in the United States.  *Id*. ¶ 27.

### e.  Numerous jurisdictions have found state bans on arms, other than firearms and including switchblades, were unconstitutional.

46.     Even before *Bruen* and relying on *Heller*, many jurisdictions had already found complete bans on the ownership of arms other than firearms are unconstitutional.

47.     The Fifth Circuit cited *Caetano v. Massachusetts*, 577 U.S. 411 (2016) in determining that stun guns are in "common use" for Second Amendment purposes:

> In addressing whether stun guns are in common use, Justice Alito, joined by Justice Thomas, implied that the number of states that allow or bar a particular weapon is important:
>
> '[T]he number of Tasers and stun guns is dwarfed by the number of

firearms. This observation may be true, but it is beside the point.... The more relevant statistic is that [200,000] ... stun guns have been sold to private citizens, who it appears may lawfully possess them in 45 States.... While less popular than handguns, stun guns are widely owned and accepted as a legitimate means of self-defense across the country.'

*Caetano*, 136 S.Ct. at 1032–33 (citations and quotation marks omitted). These two justices suggested that the 200,000 absolute number, plus that 45 states have "accepted [stun guns] as a legitimate means of self-defense," was enough to determine that the stun gun is in common use.

*Hollis v. Lynch*, 827 F.3d 436, 449 (5th Cir. 2016).

48.     Unsurprisingly, bans on electric arms were struck across the nation. *People v. Yanna*, 824 N.W.2d 241, 243 (Mich. Ct. App. 2012) (striking down a Michigan statute criminalizing possession of electronic weapons); *Avitabile v. Beach*, 368 F. Supp. 3d 404 (N.D.N.Y. 2019) (striking New York State's ban on electric arms). *Second Amendment Society v. Porrino*, No. 3:16-cv-04906-DEA (D.N.J. Nov. 16, 2016) Doc. No. 30  ("Pursuant to the holdings in *Heller*, *McDonald* and *Caetano*, N.J. Stat. Ann . § 2C:39- 3(h), to the extent this statute outright prohibits, under criminal penalty, individuals from possessing electronic arms, is declared unconstitutional in that it violates the Second Amendment to the United States Constitution and shall not be enforced"); *See Crystal Wright v. District of Columbia*, No. 1:16-cv-01556-JEB (D.D.C. Sept. 26, 2016) Doc. No. 18 (stipulating to a stay of a motion for preliminary injunction pending new legislation and agreeing not to enforce ban against plaintiffs); *Ford v. City of New Orleans*, No. 2:16-cv16433-MVL-KWR (E.D. La. Dec. 14, 2016) Doc. Nos. 17, 19-20 (stipulating that

the city will not enforce the ban against plaintiff and consenting to a stay of litigation pending enactment of legislation that decriminalized possession of stun guns); *Hulbert v. Pantelides*, No. 1:16-cv-04121-JFM (D. Md. March 3, 2017) Doc. No. 16 (letter from the City of Annapolis informing the court that the City Council passed an emergency ordinance eliminating all restrictions on ownership and possession of electronic weapons for personal defense); *Ramirez v. Commonwealth,* No. SJC-12340, 2018 Mass. LEXIS 237 (Mass. Apr. 17, 2018) (striking Mass. ban on stun guns). *See People v. Walker*, 2019 Ill. LEXIS 329, 2019 WL 1307950 (Ill. March 20, 2019) (striking Illinois's ban on taser ownership and carry).

49.    In *Maloney v. Singas*, 351 F. Supp. 3d 222 (S.D.N.Y. 2018), the United States District Court for the Southern District of New York struck the State of New York's ban on nunchucks as a violation of the Second Amendment.  The court found that the government had failed to show that nunchuka were not typically used by law-abiding citizens for lawful purposes and were entitled to Second Amendment protection.  *Maloney*, 351 F. Supp.3d at 236.  Although the Court believed determining whether nunchuka were in common use was unnecessary, it nevertheless found that the government had also failed to meet its burden in this regard, noting that "64,890 metal and wood nunchaku were sold on the retail market in the United States between 1995 and 2018." *Id*. at 237.

50.    Other jurisdictions have held that batons and blackjacks are subject to

Second Amendment protections. *State v Blocker*, 630 P2d 824 (1981) (billy clubs) (*citing State v Kessler*, 614 P2d 94 (1980)); *Barnett v State*, 695 P2d 991 (Ct App, 1985) (same as to blackjacks).

51.     Similarly, many jurisdictions have decided that bans on knives are unconstitutional.

52.     For example In New York, the balisong – another name for a butterfly knife -- has been determined not to be a prohibited knife, and therefore legal to own. See *People v. Zuniga*, 303 A.D.2d 773 (2nd Dept. 2003).

53.     In *City of Seattle v. Evans*, 366 P.3d 906 (Wash. 2015), the Washington Supreme Court evaluated a criminal conviction for carrying a paring knife.  The Court found that paring knives are not protected by the Second Amendment because paring knives are not designed to be used for self-defense. "We hold that the right to bear arms protects instruments that are designed as weapons traditionally or commonly used by law-abiding citizens for the lawful purpose of self-defense. In considering whether a weapon is an arm, we look to the historical origins and use of that weapon, noting that a weapon does not need to be designed for military use to be traditionally or commonly used for self-defense. We will also consider the weapon's purpose and intended function." *Evans*, 366 P.3d at 913. The Court went on to strongly suggest that knives designed for self-defense such as "bowie knives and swords" having been commonly used for self-defense may be considered arms.

*Id*. at 906.

54.    In *State v. Deciccio*, 105 A.3d 165 (Conn. 2014), the Connecticut Supreme Court overturned the conviction for transport of a dirk knife and a baton as a violation of the litigant's Second Amendment rights.  The Court found that dirk knives and batons are protected by the Second Amendment because they are weapons with traditional military utility that are "typically possessed by law-abiding citizens for lawful purposes" and not "dangerous and unusual weapons."  *Id*. at 625, 627. It then applied intermediate scrutiny and held the conviction unconstitutional. *See Id*.

55.    The California Appeals Court has also found that knives are protected by the Second Amendment. In *People v. Mitchell*, 209 Cal. App. 4th 1364 (Cal. App. 2012), the court held "the dirk or dagger concealed carrying restriction does not entirely prohibit the carrying of a sharp instrument for self-defense; rather, it limits the manner of exercising that right by proscribing concealed carrying of a dirk or dagger unless the bearer uses a visible knife sheath or non-switchblade folding or pocketknife. Because the statute regulates but does not completely ban the carrying of a sharp instrument, we subject it to intermediate scrutiny." *Id*. at 1374.

56.    Similarly, in *State v. Montalvo*, 162 A.3d 270 (N.J. 2017), the New Jersey Supreme Court overturned the conviction for possession of a machete. In doing so, the Court found that machete-type knives are protected by the Second

Amendment and that a conviction for their possession in the home was unconstitutional.

57.     Other courts have also recognized that knives are protected by their own state constitutions.  *See State v William S. Griffin*, 2011 WL 2083893, *27, n. 62 (Del Super Ct, May 16, 2011) (the right to keep and bear arms under the Delaware Constitution extends to knives, and concluding that the Second Amendment right does the same); *City of Akron v Rasdan*, 663 NE2d 947 (Ohio Ct. App., 1995) (concluding that the "right to keep and bear arms" under the Ohio Constitution extends to knives).

58.     More significantly, several jurisdictions have found that complete bans on switchblade knives are unconstitutional based on application of means-end scrutiny before *Bruen*.

59.     For example, in *State v. Herrmann*, 873 N.W.2d 257 (Wis. App. 2015), the Wisconsin Court of Appeals overturned appellant's conviction for possession of a switchblade. Applying intermediate scrutiny, the court found that switchblades are protected by the Second Amendment and that Wisconsin's complete ban on their possession was unconstitutional.  *Id*. at 262-63.

60.     In *State v. Delgado*, 692 P.2d 610 (1984), the Oregon Supreme Court found that Oregon's ban on the possession of switchblades violated the Oregon Constitution's right to arms.

**f.    The ban on switchblade knives is not consistent with historical tradition.**

61.    The Supreme Court has recently affirmed that the right of self-defense guaranteed by the Second Amendment does not extinguish at the threshold of the citizen's front door.  *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, __ U.S. __, 142 S. Ct. 2111, 2134–35 (2022) (holding specifically that the Second Amendment "presumptively guarantees" the right to bear arms in public for the purpose of self-defense). "To confine the right 'to bear' arms to the home would nullify half of the Second Amendment's operative protections" and "would make little sense given that self-defense is 'the central component of the [Second Amendment] right itself.'" *Id*.

62.    Post-*Bruen*, state and local governments and officials, such as Defendants, may not regulate "arms" unless that "regulation is consistent with this Nation's historical tradition" of regulating arms.  *Bruen*, 142 S. Ct. at 2126.  *Bruen* specifically rejects means end scrutiny and requires the government to "affirmatively prove that its … regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."  *Id*. at 2127.

63.    Defendant cannot meet the burden imposed by *Bruen* in regards to the complete ban of switchblade knives.

64.    Knives of all varieties have been used as tools for millenia, including for skinning animals and in various professions, including use by electricians such

as Plaintiff Roa.  David P. Kopel, Clayton E. Kramer & Joseph Edward Olson, *Knives and the Second Amendment*, Mich. Law Rev. Vol. 47:1, pp. 170-71 (Fall 2013).  A true and correct copy of this article is attached as **Exhibit Ten**.

65.    Since the Colonial Era, knives have been considered arms protected by the Second Amendment. See Kopel, David B. and Greenlee, Joseph, *The Second Amendment Rights of Young People*, 43 Southern Illinois Law Journal 495, 518-519 (2019), U Denver Legal Studies Research Paper No. 18-28, Available at SSRN: https://ssrn.com/abstract=3205664  or  http://dx.doi.org/10.2139/ssrn.3205664   A true and correct copy of this article is attached as **Exhibit Eleven.**

66.    Knives that fit within the definition of "switchblade" knives in HRS § 134-52 are "typically possessed by law-abiding citizens for lawful purposes."  *See Heller*, 554 U.S. at 502.

67.    Switchblade knives as defined in HRS § 134-52 enjoy a long tradition, dating back to well before 1791.  "Automatic knives were first produced in the 1700s, with the earliest custom made for wealthy customers."  David P. Kopel, Clayton E. Kramer & Joseph Edward Olson, *Knives and the Second Amendment*, Mich. Law Rev. Vol. 47:1, pp. 175 (Fall 2013), **Exhibit Ten**.

68.    The U.S. Patent and Trademark office issued a patent for a pocket knife opened solely by gravity to one W.F. Rockwell in 1885. A true and correct copy of

the SPECIFICATION forming part of Letters Patent No. 317,208, dated May 5, 1885 is attached as Exhibit "B" to the Lawson Declaration at ¶ 32.

69.    Pocket knives designed to be opened one-handed and with the assistance of gravity have been displaced by improvements in technology such as the Schrade Patent. A true and correct copy of the Schrade Patent is attached as Exhibit "A" to the Lawson Declaration at ¶ 22, Exhibit "A".

70.    These automatic knives, whose design has remained virtually unchanged, were not just a novelty but were in common use and even issued to our military members:

> By the mid-nineteenth century, factory production of automatic knives made them affordable for ordinary consumers. During World War II, American paratroopers were issued switchblade knives "in case they [became] injured during a jump and needed to extricate themselves from their parachutes." The switchblade enabled them to cut themselves loose with only one hand.

David P. Kopel, Clayton E. Kramer & Joseph Edward Olson, *Knives and the Second Amendment*, Mich. Law Rev. Vol. 47:1, pp. 170-71 (Fall 2013),  **Exhibit Ten**.

71.    Souvenir Second World War German military issue knives openable with one hand by gravity were brought back to this country by returning American servicemen and were common in the post-war period. Lawson Decl. ¶ 34

72.    Gravity knives were historically possessed in this country by law-abiding citizens for lawful purposes, including being armed and ready for offensive or defensive action in a case of conflict with another person. Lawson Decl.  ¶ 35

73.     In contrast, Haw. Rev. Stat. § 134-51 was first enacted in 1937.  *State v. Rackle*, 55 Haw. 531, 532, 523 P.2d 299, 300 (1974).  This Court has recently found that a similar statutory prohibition enacted in 1934 was not "longstanding and presumptively valid."  *Yukutake v. Conners*, 554 F. Supp. 3d 1074, 1083 (D. Haw. 2021).

74.     Section 134-52 of the Hawai'i Revised Statutes has only been in effect since 1959.  Accordingly, pursuant to *Conners*, *supra*., this prohibition is also not "longstanding and presumptively valid."

75.     The passage of HRS § 134-52 was undoubtedly a legislative reaction to the portrayal of juvenile delinquents in 1950's pop-culture:

> In the 1950s, there was great public concern about juvenile delinquency. This concern was exacerbated by popular motion pictures of the day, such as *Rebel Without a Cause* (1955), *Crime in the Streets* (1956), *12 Angry Men* (1957), and *The Delinquents* (1957), as well as the very popular Broadway musical *West Side Story*. These stories included violent scenes featuring the use of automatic knives by fictional delinquents. Partly because of Hollywood's sensationalism, the public associated the switchblade with the juvenile delinquent, who would flick the knife open at the commencement of a rumble with a rival gang or some other criminal activity. This was an important part the origin of the many statutes imposing special restrictions on switchblades.

David P. Kopel, Clayton E. Kramer & Joseph Edward Olson, *Knives and the Second Amendment*, Mich. Law Rev. Vol. 47:1, pp. 176 (Fall 2013); *See* Lawson Decl. ¶ 7.

76.     Defendants can produce no ban on knives from the time of the founding, based on their mode of operation or otherwise, that are sufficiently similar to HRS § 134-52 as to justify this ban under *Bruen*.

77.     Plaintiffs are bringing an as-applied and facial challenge to the applicable Hawai'i laws, HRS §§ 134-51 and/or 134-52, which prevent them from owning switchblades for purposes of lawful self-defense.

78.     Plaintiffs seek an injunction preventing enforcement of the applicable Hawai'i laws  as applied to themselves and for declaratory relief.

79.     Additionally, Plaintiffs seek an injunction preventing enforcement of the applicable Hawai'i laws as to all other law-abiding citizens.

### g.     Plaintiff Peter Roa

80.     Plaintiff Roa is imminently qualified to keep and/or bear a switchblade knife.

81.     Plaintiff Roa is an expert in self-defense and a firearms instructor who is also verified as an instructor for the concealed carry of firearms.

82.     Plaintiff Roa is an instructor for the use of deadly force.  Plaintiff Roa completed Massad Ayoob's (a world renowned self-defense and use of deadly force expert) self-defense course and became certified as an instructor.

83.     Plaintiff Roa has received specific training on the use of knives for self-defense.

84.     Plaintiff Roa is employed as an electrician.  Plaintiff Roa wishes to use an automatic knife to ease specific tasks in his work.  An automatic knife would allow Plaintiff Roa to open and close the knife with one hand to cut wires and trim insulation from the wires while holding the wires and standing on a ladder.

85.     Plaintiff Roa has the means to immediately purchase a switchblade knife should he be able to do so without the threat of prosecution.

86.     Plaintiff Roa wishes to purchase the following switchblade knives immediately and will do so as soon as he can without the threat of prosecution:

- A Benchmade 4300 CLA auto folding knife as advertised here:

  https://www.knifecenter.com/item/BM4300/benchmade-4300-cla-auto-folding-knife-stonewash-plain-blade-black-g10-handles

- A Benchmade 3300BK infidel dagger automatic out-the-front knife as advertised here:

  https://www.knifecenter.com/item/BM3300BK/benchmade-3300bk-infidel-dagger-auto-otf-knife-d2-black-double-edge-blade-black-aluminum-handles

87.     Plaintiff Roa has never been convicted of a crime that would disqualify him from firearms ownership under either Hawaiʻi or federal law.

88.     Plaintiff Roa has never been diagnosed with a mental disorder that would disqualify him from firearms ownership under Hawaiʻi or federal law.

89.    Plaintiff Roa does not take illegal drugs or abuse alcohol.

90.    Plaintiff Roa desires to keep a switchblade knife in his home for self-defense and other lawful purposes and/or to bear a switchblade in public for self-defense and other lawful purposes.  However,  Plaintiff Roa fears prosecution for possessing a switchblade knife in his home and/or in public.

91.    But for Hawai'i law, Plaintiff Roa would possess, carry, and where appropriate use a switchblade knife to protect himself, his home, his family and business.

**h.    Plaintiff Dirck Sielken**

92.    Plaintiff Sielken is imminently qualified to keep and/or bear a switchblade knife.

93.    Plaintiff Sielken has extensive training in self-defense.

94.    Plaintiff Sielken was one of the first persons on Oahu who was licensed to carry a firearm post *Bruen*.

95.    Plaintiff Sielken has the means to immediately purchase a switchblade knife should he be able to do so without the threat of prosecution.

96.    Plaintiff Sielken wishes to purchase the following switchblade knife immediately and will do so as soon as he can do so without the threat of prosecution:

- A Tekto Swift out-the-front automatic opening knife:

  https://www.tektogear.com/products/swift?variant=26398586823

- A Leverleto 7.75" Italian stiletto automatic opening knife:

  https://www.bladehq.com/item--AKC-Leverletto-7-Automatic-Italian--104097

97.    Plaintiff Sielken has never been convicted of a crime that would disqualify him from firearms ownership under either Hawaiʻi or federal law.

98.    Plaintiff Sielken has never been diagnosed with a mental disorder that would disqualify him from firearms ownership under Hawaiʻi or federal law.

99.    Plaintiff Sielken does not take illegal drugs or abuse alcohol.

100.    Plaintiff Sielken desires to keep a switchblade knife in his home for self-defense and other lawful purposes and/or to bear a switchblade in public for self-defense and other lawful purposes.  However, Plaintiff Sielken fears prosecution for possessing a switchblade knife in his home and/or in public.

101.    But for Hawaiʻi law, Plaintiff Sielken would possess, carry, and where appropriate use a switchblade knife to protect himself, his home, his family and business.

**FIRST CAUSE OF ACTION**
**U.S. CONST., AMEND. II & VIIII,**

102.    Plaintiffs repeat and re-plead the preceding paragraphs, inclusive, and incorporates the same herein by reference.

103.    Defendant prohibits Plaintiffs from possessing, carrying and using a defensive arm in common use, i.e., switchblade knives. As such it violates Plaintiffs' Second Amendment rights.

104.    Defendant's laws, customs, practices and policies generally banning the carrying and use of switchblade knives violates the Second Amendment to the United States Constitution, facially and as applied against the Plaintiffs in this action, damaging Plaintiffs in violation of 28 U.S.C. §§ 1331, 1343, 2201, 2202 and 42 U.S.C. § 1983. Plaintiffs are therefore entitled to preliminary and permanent injunctive relief against such laws, customs, policies, and practices.

## SECOND CAUSE OF ACTION
### DECLARATORY JUDGMENT

105.    Plaintiffs repeat and re-plead the preceding paragraphs, inclusive, and incorporate the same herein by reference.

106.    The Declaratory Judgment Act provides: "In a case of actual controversy within its jurisdiction, any court of the United States may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. 2201(a).

107.     Absent a declaratory judgment, there is a substantial likelihood that Plaintiffs will suffer irreparable injury in the future.

108.    There is an actual controversy between the parties of sufficient immediacy and reality to warrant issuance of a declaratory judgment.

29

109.   This Court possesses an independent basis for jurisdiction over the parties.

110.   A judgment declaring that the State of Hawaiʻi's ban on the keeping and/or bearing of switchblade knives violates the Second Amendment will serve a useful purpose in clarifying and settling the legal relations at issue and will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.

111.   Defendant's laws, customs, practices and policies generally banning the carrying and/or use of switchblade knives violates the Second Amendment to the United States Constitution, facially and as applied against the Plaintiffs in this action, damaging Plaintiffs in violation of 28 U.S.C. §§ 1331, 1343, 2201, 2202 and 42 U.S.C. § 1983. Plaintiffs are therefore entitled to a declaration declaring such laws, customs, policies, and practices unconstitutional.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request that judgment be entered in their favor and against Defendant as follows:

1.   An order preliminarily and permanently enjoining Defendant, her officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing Sections 134-51 and/or 134-52 of the Hawaiʻi Revised Statutes and any other

relevant Hawaiʻi law which bans the carrying or use of switchblade knives facially, as applied to Plaintiffs and additionally against other similarly situated law abiding persons;

2.     An order declaring that Sections 134-51 and/or 134-52 of the Hawaiʻi Revised Statutes and any other relevant Hawaiʻi law, to the extent those provisions prohibit the possession and carrying of switchblade knives, unconstitutional and violative of the Second Amendment to the United States Constitution as applied to Plaintiffs and to all other law-abiding citizens;

3.     Costs of suit, including attorney fees and costs pursuant to 42 U.S.C. §1988;

4.     Such other Declaratory relief consistent with the injunction as appropriate; and

5.     Such other further relief as the Court deems just and appropriate.

DATED:  Honolulu, Hawaiʻi,  February  10, 2023.

Respectfully submitted,

*/s/ Alan Beck*
Counsel for Plaintiffs

Alan Alexander Beck
Law Office of Alan Beck
2692 Harcourt Drive
San Diego, CA  92123
(619) 905-9105
HI Bar No. 9145
Alan.alexander.beck@gmail.com


*/s/ Richard L. Holcomb*
Counsel for Plaintiffs

Holcomb Law, LLLC
733 Bishop St., Suite 1478
Honolulu, HI  96813
(808) 545-4040
HI Bar No. 9177
rholcomblaw@gmail.com